| | |
|---|---|
| TIANJIN UNIVERSAL LINK ENTERPRISES, LTD, ) ) ) Plaintiff, ) ) v. ) ) MIDWEST CONTRACTING ) CONCEPTS, INC. and ALSAPO ) ENTERPRISES, LTD., ) ) Defendants, ) | Case No. 16 C 08352 Hon. Marvin E. Aspen |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Plaintiff Tianjin Universal Link Enterprises, Ltd. ("Plaintiff" or "Tianjin") filed this breach of contract action to recover on several contracts for the purchase of vehicles it sought to import to China. Presently before us is Defendant Alsapo Enterprises, Ltd.'s ("Alsapo") motion to dismiss Counts II, III, and IV for lack of personal jurisdiction. (Dkt. No. 35.) For the reasons stated below, we grant Alsapo's motion.

**BACKGROUND**

For the purposes of a motion to dismiss, we accept all well-pleaded factual allegations as true and draw all inferences in the plaintiff's favor. *Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016). Defendant Alsapo, a corporation organized under the laws of Cyprus, has been engaged in the business of exporting luxury vehicles to markets in Asia since at least 1984. (Am. Compl. (Dkt. No. 33) ¶ 6.) In early 2015, Alsapo sought to sell American-made vehicles to clients in China, and to that end, began discussions with a potential supplier, Mega World Builder Corp. ("Mega World"). (*Id.* ¶¶ 7–8.) After Mega World advised Alsapo that there

"could be problems with financing of the transactions due to new bank regulations," Alsapo contacted Defendant Midwest Contracting Concepts, Inc. ("Midwest"), an Illinois corporation with its principal place of business in Illinois, with whom it had a "pre-existing, personal relationship." (*Id.* ¶¶ 9–10.) Following discussions to determine whether Midwest's involvement could "solve the financing issue," Alsapo and Midwest entered into an agreement to form a joint enterprise whereby they would sell vehicles overseas to China. (*Id.* ¶¶ 3, 10–11, 84, 89, 97, 102, 116, 121, 135, 140.)

Plaintiff alleges that "[u]nder the terms of the agreement and as evidenced by their later course of dealing," Alsapo was responsible for managing the day-to-day aspects of the purchase and shipment of vehicles, including but not limited to, directly communicating with suppliers, collecting and processing paperwork necessary to facilitate shipments, monitoring progress of shipments, and updating customers. (*Id.* ¶¶ 12, 85.) Meanwhile, Midwest was responsible for securing financing for the transactions and other tasks, such as inspecting vehicles prior to shipment on an as-needed basis. (*Id.* ¶¶ 13, 86.) In consideration for their respective contributions "of money, effort, skill and knowledge," Alsapo and Midwest agreed to divide the profits and losses from the operation of their joint enterprise. (*Id.* ¶¶ 14, 87.)

In 2015, Plaintiff entered into several written agreements with Alsapo for the purchase of vehicles for import into China. (*Id.* ¶¶ 15, 46, 56, 66.) Plaintiff is a Chinese corporation engaged in international trade, including the import of new automobiles from the United States and Europe for sale in China. (*Id.* ¶ 1.) On June 30, 2015, Plaintiff entered into a written agreement with Alsapo and Midwest for the purchase of 27 new 2016 Ford Explorers (the "Explorer Agreement"). (*Id.* ¶ 15; *see also id.*, Exh. 1 (Dkt. No. 33–1).) On October 30, 2015, Plaintiff alleges it executed three separate written agreements for the purchase of 30 Range

Rovers each (the "Range Rover Agreements"). (*Id.* ¶¶ 46, 56, 66; *see also id.*, Exhs. 7–9 (Dkt. Nos. 33–7, 33–8, 33–9).) Plaintiff alleges all four of the agreements fell through after Alsapo and Midwest failed to hold up their end of the bargain.

With respect to the first of the agreements, Alsapo and Midwest worked together to negotiate an agreement with Mega World for the purchase of the Ford Explorers and to secure financing for the deal. (Am. Compl. ¶ 22.) Alsapo's President, George Samaha, traveled to Illinois on September 25, 2015 to meet with the owner of Mega World and the owner of Midwest in order to finalize the terms of the purchase agreement and to discuss other details of the transaction. (*Id.* ¶ 23.) Alsapo and Midwest performed a "last-minute background check" on Mega World and executed the purchase agreement on September 29, 2015. (*Id.* ¶¶ 24–25.) On October 2, 2015, Alsapo and Midwest issued an invoice for the Explorers to Plaintiff. (*Id.* ¶ 28.) Plaintiff subsequently provided "the required Letter of Credit pursuant to the terms of the Explorer Agreement" on October 9, 2015 based on the defendants' assurance that the vehicles were being prepared for shipment, and Alsapo and Midwest provided Plaintiff with a packing list indicating that each of the 27 Explorers had been loaded into nine sealed and numbered shipping containers scheduled to be shipped from Houston to a port in Fuzhou, China. (*Id.* ¶¶ 29–31.) Midwest's owner, George Stathopoulos, executed the bills of lading sent by Mega World, and Mega World provided the defendants with an inspection report from SGS America, Inc. ("SGS"), which purported to show that the vehicles had been placed into the containers. (*Id.* ¶¶ 21, 32–33.) Between October and December 2015, Alsapo managed day-to-day aspects of the purchase and shipment, and Midwest worked on securing the financing for the transaction. (*Id.* ¶¶ 34–35.)

In late November 2015, Alsapo and Midwest advised Plaintiff that the shipment of

Explorers would be delayed "due to certain logistical issues," but it was scheduled to arrive in Fuzhou, China on or around January 25, 2016. (*Id.* ¶ 36.) On December 21, 2015, corporate counsel for SGS "advised Alsapo and Midwest that the SGS inspection report which Mega World had produced in October could not be authenticated and was possibly a forgery." (*Id.* ¶ 37.) Neither of the defendants advised Plaintiff of this fact, nor did they tell Plaintiff that they had been unable to verify whether any of the vehicles had actually been shipped. (*Id.* ¶ 38.)

The shipment never arrived in Fuzhou, China. (*Id.* ¶ 40.) Instead, in March 2016, Plaintiff learned that the nine sealed shipping containers had arrived at a different port in Hong Kong and they were being held in a bonded warehouse awaiting customs. (*Id.* ¶ 41.) Plaintiff gained access to the shipment on March 19, 2016 and discovered that rather than the agreed-upon 27 Ford Explorers, the containers were loaded with 18 trailers and no Explorers. (*Id.* ¶ 42.) Plaintiff rejected the shipment, notified the defendants, and demanded a return of all funds it had paid pursuant to the terms of the agreement. (*Id.* ¶¶ 43–44.)

Meanwhile, before the Explorer Agreement fell apart, Plaintiff alleges it entered into three separate written agreements with Alsapo and Midwest for the purchase of 30 Range Rovers each. (*Id.* ¶¶ 46, 56, 65.) Each agreement required Plaintiff to provide 10 percent down payment by wire transfer and to provide a 90 percent irrevocable letter of credit within 12 days of Alsapo and Midwest providing the vehicle identification numbers ("VINs") for each vehicle to be purchased. (*Id.* ¶¶ 48, 58, 68.) Upon issuance and acceptance of the letter of credit, the agreements required Alsapo to initiate shipment of the vehicles within a set period of time. (*Id.* ¶¶ 49, 59, 69.) On November 5, 2015, Plaintiff paid the 10 percent down payment, but Alsapo and Midwest failed to provide the VINs as required. (*Id.* ¶¶ 50–51, 60–61, 70–71.) Plaintiff alleges it made repeated demands to Alsapo and Midwest for the VINs, and in

February 2016, an Alsapo representative conceded that it had no vehicles to ship and could not fulfill the terms of the agreement. (*Id.* ¶¶ 52–53, 62–63, 72–73.) On April 1, 2016, Plaintiff issued a demand for the return of its down payment. (*Id.* ¶¶ 54, 64, 74.) Plaintiff alleges it never obtained the vehicles, nor did it receive the return of its down payment. (*Id.* ¶¶ 55, 65, 75.)

Plaintiff alleges Alsapo and Midwest filed a complaint in Texas state court against Mega World and others, alleging they jointly negotiated and entered into contracts to purchase the Explorers and "other vehicles" from Mega World. (*Id.* ¶¶ 76–77; *see also* Dkt. No. 30–3 ¶¶ 12–15, 56–59.) In addition, Plaintiff filed its complaint in this case against Alsapo and Midwest on August 25, 2016. Plaintiff asserted four claims for breach of contract based on the alleged breach of the Explorer Agreement (Count I) and the three Range Rover Agreements (Counts II through IV). After Alsapo moved to dismiss Counts II through IV for lack of personal jurisdiction over it as to the Range Rover Agreements, we granted Plaintiff's motion to amend its complaint. (Dkt. No. 32.) Plaintiff filed an amended complaint on May 17, 2017 asserting the same four claims, and Alsapo again moved to dismiss the counts, contending the claims for breach of contract based on the three Range Rover Agreements must be dismissed for lack of personal jurisdiction. (Dkt. Nos. 33, 35.)

## LEGAL STANDARD

If a court lacks personal jurisdiction over a party to an action, it must dismiss the case as to that party. Fed. R. Civ. P. 12(b)(2). A complaint need not include facts alleging personal jurisdiction, but when a defendant moves to dismiss under Rule 12(b)(2), the plaintiff has the burden of demonstrating personal jurisdiction over the defendant. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014); *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The court may consider affidavits or other

5

evidence in opposition to or in support of the exercise of jurisdiction. *Id.* at 783. Where personal jurisdiction is challenged and material facts are in dispute, the court "must hold an evidentiary hearing to resolve them." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). "Until such a hearing takes place, the party asserting personal jurisdiction need only make out a *prima facie* case of personal jurisdiction." *Id.* "In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'" *Purdue Research Found.*, 338 F.3d at 782 (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)); *see also GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009) (courts must resolve factual disputes in the plaintiff's favor, but unrefuted assertions by the defendant will be accepted as true).

## ANALYSIS

Alsapo argues Counts II through IV of Plaintiff's amended complaint must be dismissed for lack of personal jurisdiction. Specifically, Alsapo argues that it is not subject to general jurisdiction in Illinois, and it has insufficient contacts with the state with respect to Plaintiff's claims concerning the Range Rover Agreements such that we may not exercise specific jurisdiction over it. (*See* Mem. ISO Mot. to Dismiss ("Mem.") (Dkt. No. 36) at 1–2.) Plaintiff alleges we have personal jurisdiction over Alsapo because all of its claims, including those relating to the Range Rover Agreements, arise out of Alsapo's joint venture with Midwest, an Illinois corporation. (Am. Compl. ¶ 5.)

We have personal jurisdiction over a plaintiff's state law claims if an Illinois court would have jurisdiction. *Purdue Research*, 338 F.3d at 779; Fed. R. Civ. P. 4(k)(1)(A) (in order to establish personal jurisdiction, the defendant must be "subject to the jurisdiction of a court of

general jurisdiction in the state where the district court is located"). The Illinois long-arm statute, 735 ILCS 5/2–209, governs the exercise of personal jurisdiction by an Illinois court over a nonresident. *Russell v. SNFA*, 2013 IL 113909, ¶ 29, 987 N.E.2d 778, 784 (Ill. 2013). "A state's exercise of personal jurisdiction is also subject to the demands of the Fourteenth Amendment's due process clause. Because Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010); *accord N. Grain Mktg.*, 743 F.3d at 492 ("Thus, the statutory question merges with the constitutional one—if Illinois constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so."); 735 ILCS 5/2–209(c) ("A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.").

"A forum state's courts may not exercise personal jurisdiction over a nonconsenting, out-of-state defendant unless the defendant has 'certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *N. Grain Mktg.*, 743 F.3d at 492 (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)). Defendant must have established minimum contacts with the forum state "such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183 (1985); *see also Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). "Jurisdiction cannot be avoided simply because a defendant did not physically enter the forum state." *Felland*, 682 F.3d at 673 (citing *Burger King*, 471 U.S. at 476, 105 S. Ct. at 2184).

However, lack of presence in the forum state, while not outcome determinative, is one of many considerations. *Purdue Research Found.*, 338 F.3d at 786.

To support the exercise of specific personal jurisdiction "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, ––– U.S. –––, 134 S. Ct. 1115, 1121 (2014); *see also ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 820 (N.D. Ill. 2008) ("The defendant, rather than the plaintiff or a third party, must create the contacts."). "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d, 693, 702 (7th Cir. 2010) (citing *Burger King*, 471 U.S. at 472, 105 S. Ct. at 2182). The defendant's contacts with the forum state must "directly relate to the challenged conduct or transaction" such that the plaintiff's injury "arises out of" the defendant's contacts. *Tamburo*, 601 F.3d at 702; *see also Felland*, 682 F.3d at 676 ("Even where a defendant's conduct is purposefully directed at the forum state, the plaintiff must also show that his injury 'arises out of' or 'relates to' the conduct that comprises the defendant's contacts."). Neither the Supreme Court nor the Seventh Circuit have determined how close the causal connection must be, but the Seventh Circuit has "suggested in passing that a mere 'but for' causal relationship is insufficient to establish the required nexus between a defendant's contacts and the underlying cause of action." *Felland*, 682 F.3d at 676–77.

Alsapo contends Plaintiff has failed to establish the requisite minimum contacts with Illinois concerning its alleged conduct related to the Range Rover Agreements. (*See* Mem. at 10–13.) It emphasizes that it is a foreign corporation, incorporated under the laws

of Cyprus, with its principal place of business in Nicosia, Cyprus. (*See* Am. Compl. ¶ 3; Samaha Decl. (Dkt. No. 36–1) ¶ 3.). Alsapo owns no real or personal property, has no bank accounts, and is not licensed to do business in Illinois. (Mem. at 13; Reply Br. (Dkt. No. 41) at 3; Samaha Decl. ¶ 6.) Likewise, it has no registered agent for service of process in Illinois. (Samaha Decl. ¶ 6.) Alsapo does not lease any property, maintain an office, nor have a post office box or phone number in Illinois. (*Id.* ¶ 7.) Finally, Alsapo argues it "has not made or performed any contract or promise substantially connected with the State of Illinois," and Plaintiff has not alleged that any part of the performance or negotiation of the Range Rover Agreements is related in any way to Illinois. (*Id.* ¶¶ 5, 8; *see also* Mem. at 3.)

However, Plaintiff argues that Alsapo and Midwest entered into a joint venture, and "[w]here two or more companies enter a joint venture, 'the minimum contacts of one co-venturer are attributable to other co-venturers such that personal jurisdiction over one means personal jurisdiction over all.'" *Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1030 (N.D. Ill. 2009) (quoting *Hill v. Shell Oil Co.*, 140 F. Supp. 2d 911, 914 (N.D. Ill. 2001)). Under Illinois law, "a joint venture is an association of two or more entities to carry out a single, specific purpose for a profit." *Wendt*, 613 F. Supp. 2d at 1030 (citing *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 80, 886 N.E.2d 1193, 1208 (4th Dist. 2008)). "A joint venture may be inferred from circumstances demonstrating the parties' intent to enter into a joint venture, even in the absence of a formal agreement." *Id.* Here, the parties dispute whether a joint venture

existed,[1] and to the extent that Midwest and Alsapo formed a co-venture, they disagree as to the scope of the enterprise. Plaintiff contends Alsapo unquestionably was engaged in a joint venture with Midwest as to the Explorer Agreement, and it has alleged enough to establish that the parties intended the joint venture to extend the Range Rover Agreements as well. (*Id.*) Alsapo responds that the four breach of contract counts in the amended complaint are based on "separate and distinct contracts," and Plaintiff has not established any basis for finding a joint venture as to the Range Rover Agreements. (Mem. at 6.)

Plaintiff alleges Alsapo and Midwest "entered into an agreement to form a joint enterprise whereby they would sell vehicles overseas in China" and also that the defendants "had formed and were operating as a joint enterprise" with respect to both the Explorer and Range Rover Agreements. (*See* Am. Compl. ¶¶ 3, 10–11, 84, 89, 97, 102, 116, 121, 135, 140.) In support of its position that personal jurisdiction is proper, Plaintiff also relies on Alsapo's Answer to Interrogatory No. 6, which asked Alsapo to "[i]dentify and describe in detail all business transactions which Alsapo has participated in with Midwest in the past 5 years." (Alsapo Answer to Interrog. No. 6 (Dkt. No. 40–2).) Alsapo answered:

---

[1] Plaintiff repeatedly asserts that Alsapo has "admitted" or "conceded" it was engaged in a joint venture with Midwest with respect to the Explorer Agreement, but Alsapo vigorously disputes Plaintiff's contention. (*See* Reply Br. at 4.) Rather, Alsapo claims it only admitted it agreed to "work together" with Midwest on certain transactions, but it has not gone so far as to concede it entered into a joint venture of any kind with Midwest. (*Id.*) Thus, Plaintiff's contention that "Alsapo has conceded that both Defendants are parties to the Explorer Agreement due to their ongoing joint venture" goes too far—the fact that Alsapo has not challenged personal jurisdiction with respect to the Explorer Agreement does not equate to a concession that the defendants are "parties to the Explorer Agreement due to their ongoing joint venture." (Pl.'s Resp. at 5; *see also id.* at 13.)

> The only transaction Alsapo entered with Midwest *started with the agreement to work together in 2015 in seeking to sell cars overseas in China.* The cars were to be acquired through Mega World, out of Florida, and exported through Los Angeles to China. None of the cars were to be acquired in Illinois or shipped from Illinois. This resulted in three attempted transactions with Mega World: the acquisition and export of 27 Ford Explorers, from the Ford factory in Kansas, for shipment from Houston, Texas, for export to Tianjin, in China, the attempted purchased of 7 Range Rovers from Mega World, to be shipped directly from the United Kingdom to the Port of Los Angeles for immediate export to China, and the attempted purchased through Mega World of 5 new Mercedes-Benz GL450s, to be delivered to the Port of Los Angeles.

(*Id.* (emphasis added).) Plaintiff argues the first sentence of the interrogatory response establishes a general, open-ended joint venture by the defendants to work together to sell cars overseas in China—according to Plaintiff, it does not limit the scope of the venture to the Explorer Agreement, nor can Alsapo's response otherwise be construed to exclude the Range Rover Agreements. (Pl.'s Resp. at 10–12.) Plaintiff further argues that (1) Alsapo failed to indicate that "from the outset of their agreement to work together, Defendants intended to limit the scope of the joint venture to the three identified transactions" listed in the interrogatory response; (2) Alsapo "has never claimed that the Defendants' agreement contained any limiting factors other than 'to sell cars in China'"; (3) Alsapo has not identified "any portion of the joint venture agreement which would have excluded the Range Rover Agreements; and (4) Alsapo has produced no evidence indicating that the joint venture excluded the Range Rover Agreements. (*Id.*)

It is Plaintiff's burden to establish a joint venture existed and jurisdiction is proper as a result. *Purdue Research Found.*, 338 F.3d at 782. Plaintiff's argument that the first sentence of Alsapo's interrogatory establishes a broad joint venture between Alsapo and Midwest to "sell cars overseas in China," which could include the Range Rover Agreements, ignores the rest of the interrogatory response and the contradictory affirmative evidence Alsapo presented. The

11

interrogatory answer itself provides express limitations, specifying the one transaction the Alsapo and Midwest "work[ed on] together" in furtherance of their agreement: they attempted to acquire cars from Mega World to sell to China. (Answer to Interrog. No. 6.) This agreement included the Explorer Agreement, as well as two other attempted transactions with Mega World, but there is no indication that Plaintiff or the Range Rover Agreements were involved. Additionally, Alsapo argues Midwest was not a party to the Range Rover Agreements, which likewise do not identify or reference Midwest or Mega World.[2] (Mem. at 8.)

Plaintiff's theory is further undercut by Alsapo's affirmative evidence showing that insofar as the defendants were engaged in a joint venture, the Range Rover Agreements were unrelated. Alsapo relies on the declarations of Samaha and Stathopoulos, both of which refute Plaintiff's allegations and attest to Midwest's lack of involvement in the Range Rover Agreements. (*See* Samaha Decl.; Samaha Suppl. Decl. (Dkt. No. 36–2); Stathopoulos Decl. (Dkt. No. 36–3); Reply Br. at 4–5.) Specifically, Samaha asserts that while the defendants worked together on the Explorer Agreement, they did not work together on the Range Rover Agreements. (*See* Suppl. Samaha Decl. ¶¶ 4–5.) Samaha and Stathopoulous affirm Midwest was not "involved in any way" with the Range Rover Agreements, including that Midwest: (1) was not involved in any of the negotiations between Alsapo and Plaintiff; (2) was not involved in any of the financing arrangements; (3) did not agree to share in any of the profits or

---

[2] Plaintiff acknowledges that the Range Rover Agreements do not reference Midwest anywhere, but observes that the Explorer Agreement does not mention Alsapo, despite Alsapo's consent to personal jurisdiction over the claim related to the Explorer Agreement.
(*See* Pl.'s Resp. at 4–5, 12.) Accordingly, Plaintiff concludes that examination of the contractual documents has "absolutely no bearing on whether the transaction was part of the joint venture." (Pl.'s Resp. at 13.) Plaintiff's argument goes too far. While the fact that the Range Rover Agreements do not reference Midwest may not alone be sufficient to establish personal jurisdiction over Alsapo, it is further evidence supporting the lack of connection between Alsapo and the forum state with regard to the Range Rover Agreements.

losses on the contracts; and (4) was not a party to the agreements. (Mem. at 8–9; *see also* Samaha Suppl. Decl. ¶¶ 4–11; Stathopoulos Decl. ¶¶ 5–9.) Samaha further asserts that "Alsapo, and Alsapo alone, negotiated with Tianjin and its agents to enter into the Range Rover Contracts" and "Alsapo, and Alsapo alone, negotiated with potential suppliers of the Range Rovers which were to fulfill the Range Rover Contracts, and bore the risk of profit or loss for its side of the Range Rover Contracts." (Samaha Suppl. Decl. ¶¶ 10–11.)

In response, Plaintiff only contends that Alsapo's affidavits are "conclusory, unsupported statements." (Pl.'s Resp. at 12, n.11.) Plaintiff's attempt to disregard Alsapo's declarations is nothing more than conclusory itself. Alsapo's declarations specifically deny the existence of a joint venture with respect to the Range Rover Agreements, and Plaintiff therefore must offer affirmative evidence beyond its general allegation that Midwest and Alsapo were "operating as a joint enterprise." *Purdue Research Found.*, 338 F.3d at 782–83 ("In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record,'" but "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." (quoting *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1123 (7th Cir. 1983)).

Plaintiff points to other evidence that it argues indicates the joint venture was broader than the description Alsapo provided in its discovery response. (Pl.'s Resp. at 11–12.) In particular, Plaintiff argues emails between Samaha and Stathopoulos in April and August 2015 "make[] clear that they envisioned a series of transactions that would result in the sale and export of 360 Explorers" and ultimately, the purchase of 1,200 total vehicles. (*Id.* at 12; *see also* Dkt. Nos. 40–1, 40–3.) Plaintiff argues that the emails establish the parties "were clearly

13

contemplating a large volume of ongoing transactions" and therefore, by implication, the joint venture extended to more than attempted business transactions described in Alsapo's interrogatory answer. (Pl.'s Resp. at 12.) Even assuming Plaintiff's argument is correct, it does nothing to connect the joint venture to the Range Rover Agreements—the emails Plaintiff relies on all refer to the sale of Explorers to try to fulfill a request from one of Alsapo's "good big clients . . . [for] a big volume (1200 units) of Ford cars." (Dkt. No. 40–1.)

Plaintiff also relies on an email in which an Alsapo representative asked Stathopoulos to visit a potential Los Angeles-area supplier to investigate the supplier's inventory and get price quotations for several Range Rover vehicles, stating "[w]e told them that a person from our company might visit them and I would appreciate if you can have a meeting with the guy and get a quotation and some vin numbers." (Dkt. No. 40–10.) Plaintiff contends that the "from *our* company" language supports its joint venture theory and its position that Alsapo and Midwest were working together to locate a supplier for the vehicles listed in the Range Rover Agreements. (Pl.'s Resp. at 14 (further arguing that "any other suggestion would be absurd").) Plaintiff also cites letters that it contends show Alsapo and Midwest were trying to purchase Range Rovers and Mercedes Benz vehicles from Mega World. (Dkt. No. 40–11.) However, the documents do not show any connection between Alsapo and Midwest with respect to the three Range Rover Agreements—while we construe factual disputes in Plaintiff's favor, the evidence it offers in support of its prima facie case relies on speculation and fails to draw a connection between Alsapo and the forum state with regard to the contracts at issue. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) ("[I]n a breach of contract case, it is only the 'dealings *between the parties in regard to the disputed contract*' that are relevant to minimum contacts analysis." (quoting *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.,*

14

75 F.3d 147, 153 (3d Cir. 1996)). Where "parties engage in an ongoing commercial relationship involving repeated transactions over time, it may be difficult to say exactly which past dealings regard a specific contract," but at a minimum, "past contacts involving the forum state should either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *Id.* Plaintiff's evidence does not show Alsapo had contact with Illinois in connection with the legal dispute concerning the Range Rover Agreements, nor does the evidence bear on the substance of the agreements.

"Essentially, we must assess the contractual situation and ask whether . . . [the defendant] so structured its business affairs that it reasonably could have predicted that it would be answerable in a court situated in [the forum state] for its actions with respect to these transactions." *Purdue Research Found.*, 338 F.3d at 785 (finding plaintiff failed to establish personal jurisdiction over the defendant, who did not "solicit or negotiate a contract" with a forum-state resident, did not set foot in the forum state "in furtherance of the contract," and had no course of dealing with the plaintiff). Based on the totality of the circumstances, we conclude Plaintiff has failed to make a prima facie showing of either general or specific personal jurisdiction over Alsapo with respect to the Range Rover Agreements, as the evidence does not support a conclusion that Alsapo purposefully availed itself of the benefits of conducting business in Illinois as to those agreements. *See id.* at 787. Viewing the record and all inferences in Plaintiff's favor, there is not enough evidence to establish Alsapo's connection to Illinois through a joint venture with Midwest with regard to the Range Rover Agreements. *See id.* at 782; *GCIU-Emp'r*, 565 F.3d at 1020 n.1. Plaintiff bears the burden of establishing a prima facie case that jurisdiction over Alsapo is proper in Illinois. *See Purdue Res. Found.*, 338 F.3d at 782. Based on the record before us, we cannot conclude Plaintiff has done so.

15

Accordingly, we grant Alsapo's motion to dismiss Counts II, III, and IV for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, Alsapo's motion to dismiss Counts II, III, and IV of Plaintiff's complaint is granted. It is so ordered.

_____
Hon. Marvin E. Aspen
United States District Judge

Dated: September 19, 2017
       Chicago, Illinois